# Exhibit 3

SUPERIOR COURT of the District of Columbia
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

**D.C. Superior Court**
**05/19/2020 13:15PM**
**Clerk of the Court**

Beyond Pesticides
_____
Plaintiff

vs.

EXXON MOBIL CORPORATION
5959 Las Colinas Boulevard, Irving, Texas 75039
_____
Defendant

Case Number _____ 2020 CA 002532 B _____

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Kim E. Richman
_____
Name of Plaintiff's Attorney

Address  8 W. 126th St. New York, NY 10027
_____

718-705-4579
_____
Telephone

Clerk of the Court

By _____
Deputy Clerk

Date  05/19/2020

如需翻譯,請打電話 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828로 전화주십시오.      የትርጉም እርዳታ ከፈለጉ (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
                                    Demandante

          contra

                                            Número de Caso: _____

_____
                                    Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____          *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

                                            Por: _____
_____                    Subsecretario
Dirección

_____          Fecha: _____
Teléfono
如需翻译，请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
만약에 번역을 원하시면 (202) 879-4828 로 전화주십시오.         የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                          Super. Ct. Civ. R. 4

Filed
D.C. Superior Court
05/18/2020 09:25PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| BEYOND PESTICIDES, 701 E Street, SE, Suite 200, Washington, DC 20003,<br><br>Plaintiff,<br><br>v.<br><br>EXXON MOBIL CORPORATION, 5959 Las Colinas Boulevard, Irving, Texas 75039,<br><br>Defendant. | Case No. __2020 CA 002532 B__<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

On behalf of itself and the general public, Plaintiff Beyond Pesticides, by and through its counsel, brings this action against Defendant Exxon Mobil Corporation ("ExxonMobil") concerning its false and deceptive marketing representing that it engages in and has invested significantly in the production and use of "clean" energy and environmentally beneficial technology. Beyond Pesticides alleges the following based upon information, belief, and the investigation of its counsel:

## INTRODUCTION

1. Dramatic changes to the Earth's climate have caused concern among the citizens of the District of Columbia and the country.

2. Consumers within the District and across the country believe that climate change poses an existential threat and that these changes are directly caused by the activities of humans.

3. Specifically, consumers believe that humans' use of fossil fuels for energy and the release of methane gas and carbon dioxide into the air are among the causes of climate change.

4.      Due to these concerns, consumers are reevaluating their choices and the effects of their actions on the environment.

5.      Because of these concerns, consumers, as ExxonMobil knows, are willing to seek out services or products that cause less of an adverse impact on the environment, and to support companies that purport to share their values, including a commitment to reducing impact on the environment.[1]

6.      In particular, there is a growing desire among consumers to reduce their reliance on fossil fuels, and to find opportunities that allow them to fulfil their needs while using energy generated through means they consider less harmful to the environment.[2]

7.      Oil and gas companies, because of the threat of climate change and because these industries are seen as engaging in activities that are believed, including by consumers, to cause climate change, are beginning to invest resources into clean, renewable, and less environmentally impactful forms of energy.

8.      Traditional oil and gas companies are now publicly setting long-term goals to develop new sources of "clean" energy, to reduce business practices that consumers believe lead to climate change, and to develop other environmentally beneficial technology.

9.      At the same time, many of these same companies continue to invest heavily in exploring for fossil fuels and developing infrastructure to refine and deliver these fuels in contravention of their public commitments.

---

[1] *See, e.g.*, Nielsen, The Sustainability Imperative: New Insights on Consumer Perception (Oct. 2015), https://www.nielsen.com/us/en/insights/report/2015/the-sustainability-imperative-2/ (consumer survey finding that the majority of consumers seek to support sustainable business practices with their purchases, and are more likely to buy products "from a company known for being environmentally friendly.").

[2] *See, e.g.*, David Roberts *Utilities Have a Problem: The Public Wants 100% Renewable Energy, and Quick*, Vox, (Oct. 11, 2018, 9:19 AM) www.vox.com/energy-and-environment/2018/9/14/17853884/utilities-renewable-energy-100-percent-public-opinion (stating that 70% of consumers desire electricity made without fossil fuels).

10.     ExxonMobil's advertising and marketing mislead the public by presenting ExxonMobil's clean energy activities as a significant proportion of its overall business.

11.     In contrast to ExxonMobil's representations, its investments and activities in clean energy constitute only a very small percentage of its total business, the majority of which continues to be based in traditional fossil fuels and in petrochemicals, including those used in environmentally harmful pesticides.

12.     In short, ExxonMobil is greatly overstating the level in which it engages in cleaner forms of energy and the extent to which that energy is available, thereby deceiving consumers into believing that even purchases of ExxonMobil's traditional fossil-fuel-based products are an investment in cleaner forms of energy in the future.

13.     No reasonable consumer who sees ExxonMobil's representations would expect the size of its investments or the level at which ExxonMobil generates clean energy to be as small as it is, relative to the overall size of ExxonMobil's business.

14.     By deceiving consumers about the nature and quality of the products that it produces and sells, and about the nature of its underlying business practices, ExxonMobil is able to capture the growing market of consumers in D.C. and elsewhere who are concerned about climate change and seek to support clean energy.

15.     ExxonMobil's false and misleading representations and omissions violate the District of Columbia Consumer Protection Procedures Act ("DC CPPA"), D.C. Code §§ 28-3901, *et seq.*

16.     Because ExxonMobil's marketing and advertising tend to mislead and are materially deceptive about the true nature and quality of its products and business, Beyond

Pesticides brings this deceptive advertising case on behalf of itself and the general public, and seeks relief including an injunction to halt ExxonMobil's false marketing and advertising.

## FACT ALLEGATIONS

17.     Plaintiff Beyond Pesticides brings this suit for injunctive relief under the DC CPPA against ExxonMobil, based on misrepresentations and omissions committed by ExxonMobil regarding its business practices, which ExxonMobil represents as consisting substantially of investments in biofuels, carbon capture technology, "clean" energy, including natural gas, and that ExxonMobil plans to reduce the aspects of its business that cause carbon emissions.

18.     ExxonMobil's marketing is false and deceptive because the "clean" energy and environmentally beneficial technology championed in its marketing make up only a very small percentage of its overall business and, at the same time, ExxonMobil is increasing its production and distribution of traditional fossil fuels.

19.     ExxonMobil knows that consumers increasingly and consciously seek out products and services from environmentally responsible companies.

20.     Accordingly, ExxonMobil cultivates an image of creating responsible energy solutions for consumers who wish to avoid harm to our planet, in order to motivate climate-concerned consumers to continue to purchase its products and services.

**A.      ExxonMobil Portrays Itself as a Company Transitioning Away from Its Fossil Fuel Business.**

21.     ExxonMobil purports to be an environmentally conscious company that is committed to investing in clean and renewable energy:

> Addressing the dual challenge of providing energy while managing emissions requires a long-term perspective, competency in fundamental science and engineering, and significant investment. ExxonMobil has a 135-year history as an

energy innovator and is committed to doing its part to help society address this critical challenge. ExxonMobil continues to make progress on our long-term plans. We do so with a commitment to develop new resources to ensure the world has the energy it needs while also minimizing the environmental impacts, including the risks associated with greenhouse gas emissions and climate change. . . . Over the past two decades, ExxonMobil has invested nearly $10 billion in technology and programs to reduce emissions, resulting in highly efficient operations that have eliminated or avoided more than 400 million tonnes of $CO_2$-equivalen emissions.[3]

22.     In sum, a large proportion of ExxonMobil's advertising references either ExxonMobil's efforts to reduce emissions overall or the clean energy in which it is engaged in producing.

23.     For example, a 2017 advertisement boasted that key facets of ExxonMobil's business included "improving energy efficiency, developing more clean burning natural gas . . . . [t]urning algae into biofuel, reducing energy poverty in the developing world, [and] making cars go further with less[.]" The advertisement concludes by stating that all this is from a company that people thought "just made the gas."

24.     One of the ways that ExxonMobil attempts to make consumers believe it is an environmentally conscious company is by advertising the size of the investments it has made in clean energy or in environmentally beneficial technologies.

25.     For example, in its sustainability report, ExxonMobil states that it plans to invest up to $100 million over 10 years to research and develop advanced lower-emissions technologies.[4]

26.     Elsewhere on the same website, it states that it already currently invests $1 billion per year in its "ongoing commitment to fundamental science and innovation."[5]

---

[3] *2019 Annual Report*, ExxonMobil.com, 8 (2020), https://corporate.exxonmobil.com/-/media/ Global/Files/ investor-relations/annual-meeting-materials/annual-report-summaries/2019-Summary-Annual-Report.pdf.

[4] *Developing Innovative Products and Technology*, ExxonMobil.com. https://corporate.exxonmobil.com/ Community-engagement/Sustainability-Report/Environment/Developing-innovative-products-and-technology   (last visited May 15, 2020).

[5] *Id.*

27.    ExxonMobil also maintains the website Energy Factor (energyfactor.com), which focuses on ExxonMobil's investments in clean energy and new technology.

28.    On the Energy Factor website, ExxonMobil states that the current and future investments that it advertises are in addition to the more than $9 billion ExxonMobil already invested in "researching and developing lower-emission solutions, including carbon capture and storage technology, next-generation biofuels, cogeneration and more efficient manufacturing processes" since 2000.[6]



<hr />

[6] *Working Together to Tackle Climate Risks,* EnergyFactor.com. https://energyfactor.exxonmobil.com/perspectives/working-together-to-tackle-climate-risks/ (last visited May 15, 2020).

Since 2000, we've invested more than $9 billion in researching and developing lower-emission solutions, including carbon capture and storage technology, next-generation biofuels, cogeneration and more efficient manufacturing processes.

29.     In addition to the investments in unspecified future research ExxonMobil commits to invest in, ExxonMobil also advertises which of its current activities it considers "clean."

30.     For example, on the Energy Factor website, ExxonMobil calls its natural gas unqualifiedly "clean."[7]

31.     It also states that its natural gas is "a critical part of powering North America's daily activities" and "a reliable complement to renewables," and that "natural gas-fired power plants will be essential to keep power flowing when the wind isn't blowing or the sun isn't shining."

32.     ExxonMobil also advertises its activities researching and formulating "biofuels" as part of its efforts in "clean" energy.

33.     Biofuels are combustible fuels made directly from plant or other living matter, rather than being produced by hydrocarbons removed from the earth after the living matter has decayed.

---

[7] *See The Power of Natural Gas*, EnergyFactor.com, https://energyfactor.exxonmobil.com/news/power-of-natural-gas/ ("Today, natural gas impacts lives at an unprecedented scale, generating clean and reliable electricity.") (last visited May 15, 2020).

COMPLAINT

34.     One recent television advertisement represents that ExxonMobil (through a partnership with Synthetic Genomics) will be producing fuel from algae, thereby reducing carbon emissions by 50% and leading to fields that "grow" fuel.[8]



35.     This advertisement does not contain any mention that ExxonMobil is still primarily producing far more traditional fossil fuels than it does any algae-based biofuels.

36.     ExxonMobil's website also contains additional information about its partnership with Synthetic Genomics, stating that it expects to produce only "10,000 barrels of algae-based biofuels per day by 2025."[9]

37.     In addition to its agreement with Synthetic Genomics, ExxonMobil also has a partnership with Clariant and Genomatica, which ExxonMobil states are ready to turn inedible

---

[8] *Exxon Mobil TV Commercial: Algae Potential*, iSpot.tv (2019) https://www.ispot.tv/ad/ovGn/exxon-mobil-algae-potential.
[9] *See supra* note 4.

COMPLAINT

cornstalks and other agricultural leftovers into the components needed for biofuel "at commercial scale."[10]

38.    Another recent television advertisement compares ExxonMobil's carbon capture and storage ("CCS") technology to photosynthesis, the process by which plants intake carbon dioxide and obtain their energy from the sun: "Plants capture CO2. What if other kinds of plants captured it too? If these industrial plants had technology that captured carbon like trees, we could help lower emissions."[11]

39.    This advertisement does not contain any mention that ExxonMobil is still primarily producing traditional fossil fuels but instead states that ExxonMobil is "working on ways to improve [CCS technology]. So, plants can be a little more like plants" and directs viewers to ExxonMobil's Energy Factor website.[12]

40.    According to iSpot.tv, an advertising measurement and tracking company, this advertisement had been especially impactful, generating over 1.8 billion impressions and an attention score (a metric showing a viewer's tendency to watch an advertisement instead of changing the channel, fast-forwarding, or turning off the television) of 94.85/100.[13]

41.    ExxonMobil positions itself as a leader of CCS technology stating that it has been working on its technology since the 1970s and that "ExxonMobil has cumulatively captured more

---

[10] *From Farm Leftovers to Biofuel*, EnergyFactor.com https://energyfactor.exxonmobil.com/science-technology/farm-leftovers-biofuel/ (last visited May 15, 2020).
[11] *Exxon Mobil TV Commercial: Carbon Capture*, iSpot.tv (2019) https://www.ispot.tv/ad/1W6P/exxon-mobil-carbon-capture.
[12] *Id.*
[13] *Insights Report Vehicle: Oil & Fuel Advertising on TV*, iSpot.tv, 7 (2019), https://storage.pardot.com/797423/15597/2019_iSpot_Insights_Oil_Fuel2.pdf. A Nielsen consumer survey found that viewing "an ad on television about the social and/or environmental good the product's company is doing" is a "top sustainability purchasing driver" for consumers. *See* Nielsen, *supra* note 1.

CO2 than any other company, accounting for more than 40 percent of cumulative CO2 captured" and it has an interest in more than one-fifth of the world's total carbon capture capacity.[14]

42.     Overall, ExxonMobil's advertising and websites give the impression it has a significant engagement in and has invested significantly in the production and use of "clean" energy and is a market leader in developing and employing environmentally beneficial technology.

43.     Unfortunately for consumers, this impression does not match the truth.

44.     In actuality, ExxonMobil's investments are minuscule compared to the size of its entire business. ExxonMobil's investment in renewable energy and CCS are dwarfed by its core business of traditional fossil fuel production—still considered by consumers to be a leading cause of climate change.

**B.     ExxonMobil's Investment in Clean Energy and Environmentally Beneficial Technology is Miniscule Compared to Its Core Business.**

45.     As discussed above, ExxonMobil's advertisements make at least three representations related to ExxonMobil's clean energy and technology investments:

   (a) up to $100 million over 10 years to research and develop advanced lower-emissions technologies;[15]

   (b) $1 billion per year in its "ongoing commitment to fundamental science and innovation" including environmentally beneficial technologies;[16] and

   (c) more than $9 billion since 2000 invested in "researching and developing lower-emission solutions, including carbon capture and storage technology, next-generation biofuels, cogeneration and more efficient manufacturing processes."

---

[14] *See supra* note 4.
[15] *Id.*
[16] *Id.*

46.     While this may sound like a large amount of money to consumers, this investment is only a small part of all expenditures for ExxonMobil.

47.     "Up to $100 million over 10 years" to be spent on lower-emissions technologies averages to $10 million a year.

48.     In 2019, ExxonMobil's total capital and exploration expenditures were $31.1 billion.

49.     Assuming that ExxonMobil continues to invest in its overall business at the same level, "$100 million over 10 years" equals 0.03% of its total capital and exploration expenditures annually.

50.     Even if ExxonMobil invested the entire $100 million in 2019, it would still only equal less than one-third of one percent of its total investments.

51.     Similarly, the $1 billion annually that ExxonMobil invests in its "ongoing commitment to fundamental science and innovation" which, upon information and belief, includes research and development for several segments of its business, not just those related to clean energy, is equal to just 3.2% of ExxonMobil's total capital expenditures in 2019.

52.     Since 2000, ExxonMobil's capital expenditures total well over $465 billion. Thus, the $9 billion in environmentally beneficial investments touted by ExxonMobil demonstrate that no more than 2% of ExxonMobil's capital expenditures in the past 20 years was invested in lower-emission solutions, carbon capture and storage technology, biofuels, cogeneration, and more efficient manufacturing processes, combined.

53.     The investments ExxonMobil has made in clean energy and environmentally beneficial technology are significantly less than investments ExxonMobil continues to make in its traditional fossil fuel business.

54.    Upon information and belief, such large investments in traditional fossil fuel activities and infrastructure are economically feasible only because ExxonMobil expects the investments to produce revenue for many years to come.

55.    Contrary to the impression given by the advertisement, ExxonMobil's overall engagement in fossil fuels is not being reduced but is actually growing.

56.    ExxonMobil's total crude oil production in 2019 was 5.6% higher than in 2018.

57.    In addition to its fossil fuel production, ExxonMobil also produces petrochemicals that are used for, among other things, the formulation of pesticides.[17]

58.    Petroleum-based pesticides are widely believed to be environmentally harmful. In addition to the harms associated with the extraction and production of the petroleum itself, the use of the resulting petrochemicals in agriculture leads to more toxic chemicals entering the environment and the food supply. *See infra* ¶¶ 130-31.

59.    Upon information and belief, ExxonMobil selectively highlights its small investments in low-carbon technologies in order to make consumers believe that its clean energy production and development make up a significant part of its overall business, while its fossil fuel business continues to expand.

60.    Nowhere in its advertisements touting clean energy production does ExxonMobil state what percentage of the company's investment is in oil and gas compared to how much is invested in clean energy.

61.    ExxonMobil's investments in traditional fossil fuels, which will extend the future of fossil fuels for decades, when compared to its relatively small investments in "clean" energy

---

[17] *Crop Protection*, ExxonMobilChemical.com, https://www.exxonmobilchemical.com/en/solutions-by-industry/agriculture/crop-protection (last visited May 15, 2020).

COMPLAINT

and environmentally beneficial technology is incompatible with reasonable consumers' understanding of the representations ExxonMobil makes regarding those investments.

**C.  Natural Gas Is Not a "Clean," "Critical," or "Essential" Replacement for Renewable Energy Sources.**

62.     ExxonMobil's advertisements represent that its natural gas is "clean," "critical," and an "essential" alternative to renewable forms of energy.

63.     Natural gas is not "clean." It is a fossil fuel comprised primarily of methane, a greenhouse gas that has a greater potential of negatively affecting climate change than carbon dioxide over a 20-year period.[18]

64.     The extraction, transportation, and use of natural gas release methane into the atmosphere.

65.     The combustion of natural gas to produce energy releases carbon dioxide into the atmosphere.

66.     The demand for natural gas has led to the proliferation of horizontal drilling and hydraulic fracturing (i.e. fracking) across the country.

67.     Well-publicized scientific studies show that fracking and horizontal drilling leads to pollution of the environment and groundwater and to health and safety risks for humans. Reasonable consumers, therefore, do not associate fracking and horizontal drilling with clean energy.

68.     Natural gas is frequently transported in the form of liquid natural gas ("LNG").

69.     The process to turn natural gas into liquid involves lowering the gas to an extremely low temperature, which uses a great deal of energy that is usually provided by fossil fuels.

---

[18] Rajendra Pachauri, et al., *Climate Change 2014: Synthesis Report*, Intergovernmental Panel on Climate Change, 87 (2015), www.ipcc.ch/site/assets/uploads/2018/02/SYR_AR5_FINAL_full.pdf.

COMPLAINT

70.     The extraction, storage, transportation, and use of natural gas is not what reasonable consumers would consider "clean," even if, when burned, it releases less carbon dioxide than coal.

71.     Because solar and wind energy relies on natural phenomena that may not always be present, ExxonMobil represents that natural gas can be used as a back-up fuel to balance supply and demand and that its use is more "reliable" than renewables and that the use of natural gas is "critical" or "essential."

72.     However, this is not the case. Natural gas, far from being used as a back-up fuel supply, continues to make up the vast majority of electricity generation in the United States.

73.     Even if U.S. electricity were primarily produced through renewable sources, natural gas is not the best back-up energy source.

74.     For example, at least one study found that battery storage systems can address up to 90% of demand that would otherwise currently be filled by natural gas.[19]

75.     ExxonMobil's representations that natural gas use is inevitable and has no (or reduced) environmental drawbacks misinforms the public into believing it is an unqualified sustainable option.

**D.      ExxonMobil's Representations Regarding its "Biofuel" Production are Overstated.**

76.     "Biofuel," typically in the form of either bioethanol or biodiesel, can be made out of living plants and organisms without the need for drilling for crude oil.

77.      However, biofuels are still combustible, carbon-based fuels that emit carbon dioxide when burned and can still contribute to climate change.

---

[19] Julian Spector, *Just How Much Business Can Batteries Take From Gas Peakers?* Greentech Media (May 16, 2018), https://www.greentechmedia.com/articles/read/just-how-much-business-can-batteries-take-from-gas-peakers.

78.    Many consumers consider biofuel to be a useful alternative while transitioning to renewable resources, because the production of biofuel does not involve the traditional oil exploration, and the plant matter biofuel is made of can play a role in removing carbon from the atmosphere.

79.    ExxonMobil advertises biofuel production as part of two partnerships: one with Synthetic Genomics and one with Clariant and Genomatica.

80.    ExxonMobil represents that its biofuel operations are made up of technology that turns either algae (with Synthetic Genomics) or cornstalks (with Clariant and Genomatica) into biofuel.

81.    Currently, neither ExxonMobil nor any of these three partner entities produce any biofuel.

82.    The United States produces over half of the world's bioethanol fuel.[20]

83.    By advertising its research into alternative sources for biofuel inputs, ExxonMobil creates the false impression that it currently produces some portion of the biofuel produced in the United States.

84.    Even if the current research into these sources of biofuel advances as ExxonMobil predicts, the result would be dwarfed by ExxonMobil's fossil fuel businesses.

85.    ExxonMobil predicts that by 2025, Synthetic Genomics will be able to produce 10,000 barrels of algae-based biofuels per day.

86.    Based on ExxonMobil's current production, these 10,000 barrels would represent only 0.019% of the 5.4 million barrels of petroleum products ExxonMobil sells per day through

---

[20] Renewable Fuel Association. *Annual Fuel Ethanol Production*, ethanolrfa.org, https://ethanolrfa.org/statistics/annual-ethanol-production/ (last visited May 15, 2020).

its retail channels.

**E.    ExxonMobil Overstates the Benefits of and the Level it Engages in Carbon Capture and Storage Technology.**

87.    ExxonMobil has been developing carbon capture and storage ("CCS") technology since the 1970s.

88.    ExxonMobil represents that it "has cumulatively captured more CO2 than any other company, accounting for more than 40 percent of cumulative CO2 captured" and that it has an interest in more than one-fifth of the world's total carbon capture capacity.

89.    ExxonMobil's representations create the impression that it is already engaged in CCS as a major part of its business operations, and further development will offset the carbon release through the combustion of the petroleum products it sells.

90.    However, CCS technology has yet to be proven to be technologically or financially viable at a scale sufficient to offset the effects of ExxonMobil's production and the use of its petroleum products.[21]

91.    ExxonMobil's advertising also overstates how much its current CCS technology can make "[industrial] plants more like [photosynthetic] plants." A genuine photosynthetic plant is capable of pulling carbon dioxide directly from the air wherever it is planted, whereas ExxonMobil's industrial CCS is primarily only incorporated as part of major point sources, such as power plants.

92.    Thus, ExxonMobil's CCS systems have little to no effect on the carbon dioxide produced from consumers burning ExxonMobil gasoline.

---

[21] Oakley Shelton-Thomas, *Sorry, Fossil Fuel Industry. 'Carbon Capture' Isn't A Magic Climate Cure*, Food and Water Watch (Apr. 10, 2020), https://www.foodandwaterwatch.org/sorry-carbon-capture-isnt-magic-climate-cure.

COMPLAINT

93.     In fact, ExxonMobil's CCS systems are being used in ways that consumers consider environmentally harmful.

94.     For example, one of ExxonMobil's existing CCS systems is based at the Shute Creek Gas Processing Plant near LaBarge, Wyoming.

95.     Once the carbon dioxide is captured from the Shute Creek plant, it is transferred via pipeline to existing oil exploration operations to be used for enhanced oil recovery.

96.     Enhanced oil recovery uses captured carbon dioxide to extract crude oil from oil fields that cannot be extracted otherwise, thereby increasing the amount of crude oil that can be refined into gasoline and then burned.

97.     In addition to increasing the amount of crude oil produced, CCS enhanced oil recovery can also bring heavy metals and radioactive materials to the surface, where they can enter soil and water supplies.

98.     Overall, ExxonMobil's representations give a false impression of the relative scale of "clean" energy and environmentally beneficial technology in ExxonMobil's business.

**F.     ExxonMobil Has Deceived Consumers and Is Aware That Its Representations Were False.**

99.     While ExxonMobil's business does harm to the environment directly, the claim alleged herein relates only to ExxonMobil's false and misleading advertising practices.

100.    ExxonMobil holds itself out to the public as a trusted expert in "clean" energy production and environmentally beneficial technology.

101.    The true nature of ExxonMobil's business is known to ExxonMobil.

102.    Therefore, ExxonMobil has actual and constructive knowledge of the extent of its business practices and investments. As one of the world's leading oil companies, ExxonMobil

knows or should know that its business practices do not meet the levels that reasonable consumers would expect based on ExxonMobil's representations.

103.    ExxonMobil knows what representations it makes regarding its products and services.

104.    Consumers frequently rely on the information provided in television ads, print ads, social media, and on companies' websites when making the decision to purchase goods or services.

105.    Reasonable consumers lack the information and scientific knowledge necessary to ascertain the true nature of ExxonMobil's practices.

106.    Reasonable consumers must, and do, rely on ExxonMobil to honestly report the nature of its products and its business practices.

107.    Reasonable consumers are misled and deceived by ExxonMobil's representations into believing that ExxonMobil is committed to developing and currently substantially engaged in clean and renewable energy.

108.    In 2019, ExxonMobil spent more on television advertising than any of its competitors. In fact, when combined with television advertising expenditures with ExxonMobil's other brand, Mobil, its total television advertising expenditures were greater than the next three largest advertisers combined.[22]

109.    In making the false, misleading, and deceptive representations and omissions at issue, ExxonMobil also knew and intended that consumers would seek out products and services that were represented as being environmentally beneficial or, at least, environmentally harmless.

---

[22] iSpot.tv, *supra* note 13. at 4.

110.    ExxonMobil's conduct in representing that its business is environmentally progressive and committed to investing in clean and renewable energy deceived and/or is likely to deceive the public.

111.    Reasonable consumers cannot discover the true nature of ExxonMobil's businesses from ExxonMobil's representations.

112.    Discovery of the true nature of ExxonMobil's businesses requires knowledge of the energy industry that is not available to the average reasonable consumer.

113.    The true nature of ExxonMobil's business is known to ExxonMobil, but it has not been disclosed to consumers in the District of Columbia.

114.    To this day, ExxonMobil continues to obscure facts regarding the true nature of its business.

115.    Upon information and belief, ExxonMobil has failed to remedy the problems with the marketing of its products and services.

116.    D.C. consumers are at risk of real, immediate, and continuing harm if ExxonMobil's misleading representations continue.

117.    ExxonMobil has failed to provide adequate relief to D.C. consumers as of the date of filing this Complaint.

118.    Plaintiff contends that ExxonMobil's products and services were sold pursuant to deceptive, unfair, and unlawful trade practices.

119.    Plaintiff seeks declaratory relief in the form of an order declaring ExxonMobil's conduct to be unlawful, as well as injunctive relief putting an end to ExxonMobil's deceptive and unfair business practices.

## JURISDICTION AND VENUE

120.   This Court has personal jurisdiction over the parties in this case. Plaintiff Beyond Pesticides, by filing this Complaint, consents to this Court having personal jurisdiction over it.

121.   Beyond Pesticides is headquartered in, and has members and staff based in, the District of Columbia.

122.   This Court has personal jurisdiction over Defendant pursuant to D.C. Code § 13-423. Defendant has sufficient minimum contacts with the District of Columbia to establish personal jurisdiction of this Court over it because, *inter alia*, ExxonMobil is engaged in deceptive schemes and acts directed at persons residing in, located in, or doing business in the District of Columbia, or otherwise purposefully avails itself of the laws of this District through its marketing and sales of its products and services in this District.

123.   This Court has subject matter jurisdiction over this action pursuant to D.C. Code §§ 28-3905(k)(1)(B), (k)(1)(D), and (k)(2).

## PARTIES

124.   Beyond Pesticides is a 501(c)(3) non-profit, public-interest organization whose mission is to protect the environment and to educate consumers and businesses about the harms that humans have on the environment.

125.   Beyond Pesticides is based in the District of Columbia and performs its work throughout the United States, including in the District of Columbia.

126.   Beyond Pesticides was formed in 1981 as a non-profit organization meant to inform the public of the dangers of toxic pesticides, and advocate on behalf of the public against their use.

127.    Beyond Pesticides educates the public so consumers can make informed choices when they shop. Beyond Pesticides' website, publications, public education, research, network building, and mobilization activities provide an important service to consumers and community activists.[23]

128.    Beyond Pesticides has an interest in truth-in-advertising regarding environmental concerns. The organization diligently works to promote ecological systems that are clean, accessible, and free of contamination.

129.    For example, Beyond Pesticides produces the quarterly newsletter *Pesticides and You*, which provides in-depth articles and a voice for pesticide safety and alternatives. In 2000, an article appeared in Pesticides and You that identified how global warming could lead to a boom in insect populations that would require a greater application of pesticides.[24] In 2007, Pesticides and You published another article that took a more proactive response to climate change, arguing that farmers can reduce their carbon footprint and counteract some of the effects of climate change by transitioning to organic farming.[25]

130.    With many toxic pesticides, herbicides, and fertilizers deriving from petroleum, the fossil fuel industry has long been a central concern of Beyond Pesticides.[26] Beyond Pesticides has

---

[23]    See, e.g., Beyond Pesticides, *Environmental Benefits of Organic Agriculture*, https://www.beyondpesticides.org/programs/organic-agriculture/why-organic/environmental-benefits (last visited May 15, 2020) (describing the challenges that climate change has on agriculture and how organic farming can be a tool to reverse some of its effects).

[24]    Paul R. Epstein, *Is Global Warming Harmful to Health?* Pesticides and You, https://www.beyondpesticides.org/assets/media/documents/infoservices/pesticidesandyou/Winter%2000-01/Is%20Global%20Warming%20Harmful%20to%20Health.pdf.

[25]    Paul Hepperly, *The Organic Farming Response to Climate Change*, Pesticides and You (Spring 2007), https://www.beyondpesticides.org/assets/media/documents/infoservices/pesticidesandyou/Spring%202007/hepperly.pdf.

[26]    *See, e.g.*, Beyond Pesticides, *11 Reasons to Buy Local and Buy Organic*, Pesticides and You (Spring 1993), https://www.beyondpesticides.org/assets/media/documents/organicfood/reportsandpublications/11%20reasons.pdf (noting that one-fifth of all petroleum in the United States is used in agriculture, in the form of harmful pesticides and fertilizers).

actively campaigned to educate the public and policymakers about the threat posed by such petroleum-based chemicals, which enter the environment and our food supply, killing wildlife and increasing the risk of disease in human populations.[27] Beyond Pesticides' executive director served on the U.S. government's National Organic Standards Board from 2010 to 2015, overseeing regulation of harmful petroleum-based chemicals under the Organic Foods Production Act.

131.    Beyond Pesticides has also campaigned on the dangers associated with the extraction and production of petroleum itself, which damages the soil and water, directly contaminating the food supply and making organic farming—and thus the phaseout of toxic pesticides—more difficult.[28]

132.    Consequently, Beyond Pesticides has a sufficient nexus to consumers of ExxonMobil's services to adequately represent those interests.

133.    Defendant ExxonMobil is one of the largest oil companies in the world and produces and markets petroleum under its Exxon and Mobil brands, as well as the Esso brand.

134.    At all times mentioned herein, ExxonMobil was and is a publicly traded corporation incorporated in New Jersey and maintains its headquarters in Irving, Texas. Defendant was and is, at all relevant times, engaged in commercial transactions throughout the District of Columbia.

135.    ExxonMobil markets and sells its products and services in the District of Columbia and throughout the United States.

---

[27] Beyond Pesticides, *The Truth About Mosquitoes, Pesticides and West Nile Virus: A Beyond Pesticides Fact Sheet*, https://www.beyondpesticides.org/programs/mosquitos-and-insect-borne-diseases/documents/the-truth-about-mosquitoes,-pesticides-and-west-nile-virus (last visited May 15, 2020) (describing how petroleum distillates in common pesticides exacerbate harms to health and the environment).

[28] *See, e.g.*, Beyond Pesticides, *Extreme Weather Events Create Chemical Health Risks* (Sept. 28, 2017), https://beyondpesticides.org/dailynewsblog/2017/09/extreme-weather-events-create-chemical-health-risks/.

COMPLAINT

136.     Upon information and belief, ExxonMobil has caused harm to the general public of
the District of Columbia.

137.     Beyond Pesticides is acting on behalf of itself and for the benefit of the general
public as a private attorney general pursuant to D.C. Code § 28-3905(k)(1). Beyond Pesticides is
a public-interest organization pursuant to D.C. Code § 28-3901(a)(15).

### CAUSE OF ACTION
### VIOLATION OF THE DISTRICT OF COLUMBIA
### CONSUMER PROTECTION PROCEDURES ACT

138.     Pursuant to D.C. Code §§ 28-3905(k)(1) and 28-3905(k)(2), Plaintiff Beyond
Pesticides brings this Count against ExxonMobil on behalf of itself, its members, and the general
public of the District of Columbia, for ExxonMobil's violation of DC CPPA, D.C. Code § 28-
3901, *et seq.*

139.     Plaintiff incorporates by reference all the allegations in the preceding paragraphs
of this Complaint.

140.     ExxonMobil represents that it engages in cleaner forms of energy at a significant
level, when in fact, its core business remains entrenched in the production and delivery of fossil
fuels.

141.     ExxonMobil's advertising misrepresents, tends to mislead, and omits facts
regarding the characteristics, standard, quality, and grade of its business practices and the products
and services it sells.

142.     ExxonMobil's products, services, and business practices lack the characteristics,
benefits, standards, qualities, or grades that ExxonMobil states and implies in its advertisements.

143.     ExxonMobil knowingly did not sell its products and services as advertised.

-23-
COMPLAINT

144.    The facts, as alleged above, demonstrate that ExxonMobil has violated the DC CPPA, D.C. Code § 28-3901 *et seq*. Specifically, ExxonMobil has violated D.C. Code § 28-3904, which makes it an unlawful trade practice to:

> (a)    represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; . . .
>
> (d)    represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;
>
> (e)    misrepresent as to a material fact which has a tendency to mislead; . . .
>
> (f)    fail to state a material fact if such failure tends to mislead;
>
> (f-1)    [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead; . . . [or]
>
> (h)    advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered.

145.    The DC CPPA makes such conduct an unlawful trade practice "whether or not any consumer is in fact misled, deceived or damaged thereby." D.C. Code § 28-3904.

146.    Plaintiff Beyond Pesticides need not show proof of deception to succeed on its DC CPPA claim; nevertheless, upon information and belief, consumers were, in fact, deceived.

147.    Beyond Pesticides has a sufficient nexus to consumers of ExxonMobil's products and services to adequately represent those interests.

148.    Because ExxonMobil misrepresents the characteristics and benefits of the products it provides; misrepresents the standard, quality, and grade of the products; and advertises its products and services without the intent to provide them as advertised, ExxonMobil's marketing

-24-

COMPLAINT

of its services violates D.C. Code §§ 28-3904(a), (d), (e), (f), (f-1), and (h).

149.    ExxonMobil is a "person" within the meaning of D.C. Code § 28-3901(a)(1), a merchant under § 28-3901(a)(3), and provides "goods and services" within the meaning of § 28-3901(a)(7).

150.    Any consumer has the right to bring an action for redress of ExxonMobil's unlawful behavior, *see* D.C. Code § 28-3905(k)(1)(A), and the statute does not limit consumer plaintiffs according to whether they purchased the product at issue. Nevertheless, as alleged in this Complaint, the petroleum products are marketed and provided in the District, and consumers within the District have obtained these products under the misrepresentations made by ExxonMobil. Therefore, a variety of purchasing and non-purchasing consumers could bring an action against ExxonMobil based on the misrepresentations and omissions listed in this Complaint.

151.    Pursuant to D.C. Code § 28-3905(k)(1)(D)(i), "a public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice."

152.    The only limitation on this power of a public interest organization to act on behalf of consumers is that the public interest organization must have "sufficient nexus to the interests involved of the consumer or class to adequately represent those interests." D.C. Code § 28-3905(k)(1)(D)(ii). As set forth in this Complaint, *see supra* ¶¶ 124-132, Beyond Pesticides was founded with the purpose of advocating for and educating consumers, including consumers in the District of Columbia, in the arena of environmental responsibility. In addition, Beyond Pesticides has retained the undersigned competent counsel, who have significant experience in litigating

under the CPPA, to pursue this action, and Beyond Pesticides has previously represented District

consumers in similar actions under the CPPA.

153.     Via § 28-3905(k)(1)(D)(i), the DC CPPA allows for public interest organizational

standing to the fullest extent recognized by the D.C. Court of Appeals in its past and future

decisions addressing the limits of constitutional standing under Article III.

154.     Beyond Pesticides is a "person" within the meaning of D.C. Code § 28-3901(a)(1)

and a "public interest organization" within the meaning of D.C. Code § 28-3901(a)(15).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Beyond Pesticides prays for judgment against Defendant

ExxonMobil, and requests the following relief:

A.     a declaration that ExxonMobil's conduct is in violation of the DC CPPA;

B.     an order enjoining ExxonMobil's conduct found to be in violation of the DC CPPA;

and

C.     an order granting Plaintiff costs and disbursements, including reasonable attorneys'

fees and expert fees, and prejudgment interest at the maximum rate allowable by law.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: May 15, 2020

_____
Kim E. Richman (Bar No. 1022978)
Richman Law Group
8 W. 126th Street
New York, NY 10027
Telephone: (212) 687-8291
Facsimile: (212) 687-8292
krichman@richmanlawgroup.com

*Attorney for Plaintiff*

-26-
COMPLAINT

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

BEYOND PESTICIDES,

Case Number: __2020 CA 002532 B__

vs

Date: __May 15, 2020__

EXXON MOBIL CORPORATION

☐ One of the defendants is being sued
in their official capacity.

| Name: *(Please Print)*   Kim E. Richman | Relationship to Lawsuit |
|---|---|
| Firm Name:   Richman Law Group | ☒ Attorney for Plaintiff |
| Telephone No.:        Six digit Unified Bar No.:<br>(718) 878-4707            1022978 | ☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury          ☐ 6 Person Jury          ☒ 12 Person Jury

Demand: $ __N/A__                                         Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____   Judge: _____   Calendar #:_____

Case No.:_____   Judge: _____   Calendar#:_____

---

NATURE OF SUIT:      *(Check One Box Only)*

**A. CONTRACTS**                                    **COLLECTION CASES**

☐ 01 Breach of Contract        ☐ 14 Under $25,000 Pltf. Grants Consent   ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty        ☐ 17 OVER $25,000 Pltf. Grants Consent    ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument     ☐ 27 Insurance/Subrogation               ☐ 26 Insurance/Subrogation
☐ 07 Personal Property                 Over $25,000 Pltf. Grants Consent         Over $25,000 Consent Denied
☐ 13 Employment Discrimination ☐ 07 Insurance/Subrogation               ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees             Under $25,000 Pltf. Grants Consent        Under $25,000 Consent Denied
                               ☐ 28 Motion to Confirm Arbitration
                                       Award (Collection Cases Only)

---

**B. PROPERTY TORTS**

☐ 01 Automobile            ☐ 03 Destruction of Private Property   ☐ 05 Trespass
☐ 02 Conversion            ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

---

**C. PERSONAL TORTS**

☐ 01 Abuse of Process          ☐ 10 Invasion of Privacy           ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection   ☐ 11 Libel and Slander                    Not Malpractice)
☐ 03 Assault and Battery       ☐ 12 Malicious Interference        ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☐ 13 Malicious Prosecution       ☐ 19 Wrongful Eviction
☒ 05 Deceit (Misrepresentation) ☐ 14 Malpractice Legal            ☐ 20 Friendly Suit
☐ 06 False Accusation          ☐ 15 Malpractice Medical (Including Wrongful Death) ☐ 21 Asbestos
☐ 07 False Arrest              ☐ 16 Negligence- (Not Automobile,  ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                            Not Malpractice)            ☐ 23 Tobacco
                                                                 ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE        IF USED

CV-496/June 2015

# Information Sheet, Continued

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10  Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability
- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

**D.  REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature

May 15, 2020
_____
Date

CV-496/ June 2015

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

BEYOND PESTICIDES
    Vs.                                        C.A. No.       2020 CA 002532 B
EXXON MOBIL CORPORATION

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Robert E. Morin

Case Assigned to: Judge FERN FLANAGAN SADDLER
Date:  May 18, 2020
Initial Conference: 9:30 am, Friday, August 14, 2020
Location:   Courtroom 100
           500 Indiana Avenue N.W.
           WASHINGTON, DC 20001

CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin

CAIO-60

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| BEYOND PESTICIDES,<br><br>                         Plaintiff,<br><br>    v.<br><br>EXXON MOBIL CORPORATION,<br><br>                         Defendant. | Case No. 2020 CA 002532 B |

## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## TO DEFENDANT EXXON MOBIL CORPORATION

Plaintiff Beyond Pesticides ("Plaintiff" or "Beyond Pesticides"), by and through its attorneys, hereby submits the following Interrogatories to be answered in writing and under oath by Exxon Mobil Corporation ("You," "ExxonMobil," or "Defendant"). Defendant's response is due within 30 days from service as required by the Rule 33 of the Superior Court Rules of Civil Procedure.

### DEFINITIONS

1.      "You" and "your" refer to Defendant, including (as may apply depending upon the time frame of a given interrogatory), its general partner, its parent and subsidiary companies, its predecessors-in-interest, its successors-in-interest, its executives, officers, agents, employees, and any other person acting on its behalf, including attorneys.

2.      "Document" and "documents" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Rule 34(a)(1)(A) of the Superior Court Rules of Civil Procedure. A draft or non-identical copy is a separate document within the meaning of this term.

1

3.     "Concerning" means relating to, referring to, describing, evidencing, or constituting.

4.     "Person" is defined as any natural person or any legal entity, including, without limitation, any business, governmental entity, or association.

5.     "Third party" means an entity other than the parties to this action.

6.     "Market," "marketing," and "marketing materials" mean the use of any print advertisement, Internet advertisement, social media presence, radio advertisement, television advertisement, billboard, banner advertisement, website, letter, postcard, brochure, pamphlet, label, packaging, carton, offer, placard, indoor or outdoor display, employee uniform, motor vehicle, equipment and supplies (including, but not limited to bags, machinery, and tools), or other attempt, effort, or process that conveys any information, invitation, or offer to any person to become aware of, purchase, review, compare, or otherwise acquire any product.

7.     "Purchase" means to acquire for consideration, including with or by cash, check, money order, refund, debit card, credit card, gift certificate, exchange, or store credit.

8.     "Customer" or "Consumer" means the end recipient of the products.

9.     "'Clean' energy and environmentally beneficial technology" means Defendant's marketing representations challenged in the complaint in this action, specifically, the representations that Defendant engages in cleaner forms of energy, such as the use of "clean" natural gas (Complaint "Compl." ¶ 62), the development of biofuels (Compl. ¶ 80), and the use of carbon capture and storage ("CCS") (Compl. ¶ 88), at a significant level, including public commitments to reducing emissions and mitigating risks related to climate change.

10.     When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person,

additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

11.    When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).  In the alternative, the responding party may produce the documents, together with identifying information sufficient to satisfy Rule 33(d) of the Superior Court Rules of Civil Procedure.

## INSTRUCTIONS

1.    Whenever a reference to a business entity appears, the reference shall mean the business entity, its affiliated companies, partnerships, divisions, subdivisions, partners, directors, officers, employees, agents, clients and/or other representatives of affiliated third parties.

2.    Provide a separate and complete response (or, as the case may be, separate objections) for each Interrogatory.

3.    Please set forth the actual language of each Interrogatory in full immediately prior to your response or objection to the Interrogatory.

4.    Each Interrogatory shall be construed independently and not with reference to any other Interrogatory for the purpose of limitation or exclusion.

5.    Each Interrogatory herein seeks all information within the knowledge, possession, custody, or control of Defendant and its attorneys or agents, and any other person acting on Defendant's behalf. In answering these Interrogatories, you are required to furnish such information as is in your knowledge, possession, custody, or control, including information in the

possession of your attorney or anyone employed on your attorney's behalf or anyone employed on your behalf, not merely such information known of your own personal knowledge.

6.     If the person who verifies the answers to the Interrogatories does not have personal knowledge of the information contained in the answers, that person shall, for each answer not verified by personal knowledge, identify the person or persons from whom the information was obtained or, if the source of information is documentary, provide a full description, including the location thereof.

7.     If at any time after answering these Interrogatories you determine that an answer you provided was false or incomplete, you must immediately notify Plaintiff's counsel and provide amended answers as soon as reasonably possible

8.     If you object to any part of an Interrogatory and refuse to answer that part, state your objection and answer the remaining portion of that Interrogatory. If you object to the scope or time period of an Interrogatory and refuse to answer for that time period or scope, state your objection and answer the Interrogatory for the scope or time period you believe is appropriate (including in your answer a specific statement as to why you believe the scope or time period is inappropriate).

9.     If, in responding to the Interrogatories, you claim that there is an ambiguity in either a particular Interrogatory or in a definition or an instruction applicable thereto, such claim shall not be used by you as a basis for refusing to respond, but you shall set forth as part of the response the language deemed to be ambiguous and the interpretation chosen or used in responding to the particular Interrogatory.

10.     The use of the singular herein shall be deemed to include the plural.

11.     The use of the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the interrogatory all responses that might otherwise be construed to be outside of its scope.

12.     The terms "all," "any," and "each" shall be construed as encompassing any and all.

13.     The following Interrogatories are continuing in nature and, in the event you become aware of or acquire additional information relating or referring thereto, such additional information is to be promptly provided.

14.     For purposes of interpreting or construing the following Interrogatories, the terms used are to be given their most expansive and inclusive interpretation unless otherwise specifically limited in the interrogatory itself. Verb tenses shall be interpreted to include past, present, and future tenses.

15.     Defined terms may or may not be capitalized or made uppercase; the given definitions apply even if a term in question is not capitalized or made uppercase.  No waiver of a definition is implied by the use of a defined term in a non-capitalized or lowercase form.

16.     Unless otherwise specified, all requests are limited to information pertaining to the marketing, and sale of the products and services (e.g. service stations) within the District of Columbia, including information pertaining to any decisions and actions affecting the manufacture, marketing, and sale of products and services within the District of Columbia, regardless of where those decisions or actions took place.

17.      Unless otherwise specified, all interrogatories cover the period from May 2017 through the present.

## INTERROGATORIES

1.      Identify all persons involved in answering or providing information in response to these Interrogatories.

2.      Describe in detail the factual basis for your representation that ExxonMobil engages in and has invested significantly in the production and use of "clean" energy and environmentally beneficial technology.

3.      Provide your current and any past definition(s) for "clean energy" and "environmentally beneficial" as those are the terms that are used in your advertising and labeling.

4.      Identify the date that you first began marketing your company as being engaged in "clean" energy and environmentally beneficial technology.

5.      Identify the date that you first began marketing your company as being significantly invested in the development, use, and production of "clean" energy and environmentally beneficial technology.

6.      Identify and describe how you communicated your definitions of "clean energy" and "environmentally beneficial" to your partners and collaborators as referenced on page 5 of your 2019 Summary Annual Report ("2019 Report") (Compl. ¶ 21) and ensured their compliance with that definition.

7.      Identify the proportion of your investment portfolio which concerns "clean" energy and environmentally beneficial technology.

8.      State whether you, either internally or through third parties, conduct or cause to be conducted internal or third-party audits, evaluation, or analysis to monitor the percentage of Your investments in "clean" energy and environmentally beneficial technology in comparison to investments in non "clean" energy, such as fossil fuels (*see* Compl. ¶ 11).

9.      Identify and describe the decision process behind your public commitments to environmental efforts and sustainable climate change solutions as mentioned in Your 2019 Report (Compl. ¶ 21).

10.    Identify any third-party marketing firm involved in the marketing of the products, with regard to the "clean" energy and environmentally beneficial technology representations.

11.    State the date or dates that any portion of the "clean" energy and environmentally beneficial technology representations, were changed and/or modified for any reason and state or describe the change that was made at each point in time.

12.    Identify and describe any research conducted by you, or caused by you to be conducted, concerning consumer impressions of and reactions to the use of the "clean" energy and environmentally beneficial technology representations and public commitments to reducing emissions, such as the statements made on page 6 of your 2019 Report (Compl. ¶ 21) and representations referenced in paragraphs 26-39 of the Complaint, and mitigating risks related to climate change (*see* Compl. ¶ 7).

13.    Identify the person(s) responsible for receiving, responding to, processing, and/or maintaining records of consumer complaints or inquiries related to ExxonMobil's marketing representing that it engages in and has invested significantly in the production and use of "clean" energy and environmentally beneficial technology.

Date: June 11, 2020                    **RICHMAN LAW GROUP**

                                       /s/ Kim E. Richman
                                       Kim E. Richman
                                       8 West 126th Street
                                       New York, New York 10027
                                       Telephone: (718) 705-4579
                                       Facsimile: (718) 228-8522
                                       krichman@richmanlawgroup.com

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| BEYOND PESTICIDES,<br><br>                Plaintiff,<br><br> v.<br><br>EXXON MOBIL CORPORATION,<br><br>             Defendant. | Case No. 2020 CA 002532 B |

### PLAINTIFF'S REQUESTS FOR PRODUCTION OF DOCUMENTS
### TO DEFENDANT EXXON MOBIL CORPORATION

Plaintiff Beyond Pesticides ("Plaintiff" or "Beyond Pesticides"), by and through its attorneys, hereby submits the following Document Requests to be answered in writing and under oath by Exxon Mobil Corporation ("You," "ExxonMobil," or "Defendant"). Defendant's response is due within 30 days from service as required by Rule 34(b)(2) of the Superior Court Rules of Civil Procedure.

### DEFINITIONS

1.     "You" and "your" refer to Defendant, including (as may apply depending upon the time frame of a given interrogatory), its general partner, its parent and subsidiary companies, its predecessors-in-interest, its successors-in-interest, its executives, officers, agents, employees, and any other person acting on its behalf, including attorneys.

2.     "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

3.     "Document" and "documents" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Rule

34(a)(1)(A) of the Superior Court Rules of Civil Procedure. A draft or non-identical copy is a separate document within the meaning of this term.

4.      "Concerning" means relating to, referring to, describing, evidencing, or constituting.

5.      "Person" is defined as any natural person or any legal entity, including, without limitation, any business, governmental entity, or association.

6.      "Third party" means an entity other than the parties to this action.

7.      "Market," "marketing," and "marketing materials" mean the use of any print advertisement, Internet advertisement, social media presence, radio advertisement, television advertisement, billboard, banner advertisement, website, letter, postcard, brochure, pamphlet, label, packaging, carton, offer, placard, indoor or outdoor display, employee uniform, motor vehicle, equipment and supplies (including, but not limited to bags, machinery, and tools), or other attempt, effort, or process that conveys any information, invitation, or offer to any person to become aware of, purchase, review, compare, or otherwise acquire any product or service.

8.      "Customer" or "Consumer" means the end recipient of the Products.

9.      "'Clean' energy and environmentally beneficial technology" means Defendant's marketing representations challenged in the complaint in this action, specifically, the representations that Defendant engages in cleaner forms of energy, such as the use of "clean" natural gas (Complaint "Compl." ¶ 62), the development of biofuels (Compl. ¶ 80), and the use of carbon capture and storage ("CCS") (Compl. ¶ 88), at a significant level, including public commitments to reducing emissions and mitigating risks related to climate change.

## **INSTRUCTIONS**

1.      The Requests set out below apply to all documents in your possession, custody or control, or in the possession, custody or control of persons acting or purporting to act on your behalf, including, but not limited to: all of your facilities, divisions, corporate parents and subsidiaries, merged and acquired predecessors, affiliates, partners, officers, directors, agents, consultants, attorneys, investigators, and insurers.

2.      You should produce documents separately, as far as reasonably practical, according to each of the numbered paragraphs set forth below. To the extent documents are furnished in connection with one Request, you need not re-produce them in response to a subsequent Request.

3.      Each request below extends to any Documents in Defendant's possession, custody or control. A Document is in Defendant's possession, custody, or control: (i) if it is in Defendant's physical custody or (ii) if it is in the physical custody of any other person and Defendant: (a) owns such Document in whole or in part; (b) has a right by contract, statute, or otherwise to use, inspect, examine, or copy such Document on any terms; (c) has an understanding, express or implied, that Defendant may use, inspect, examine, or copy such Document on any terms; or (d) has, as a practical matter, been able to use, inspect, examine, or copy such Document when Defendant has sought to do so. Such Documents shall include, without limitation, Documents in the custody of Defendant's attorneys or other agents.

4.      These requests are continuing in nature pursuant to Rule 26 of the Superior Court Rules of Civil Procedure and require timely supplementation if you obtain, create, develop, or discover further responsive information or determine your existing responses are inaccurate, inadequate, or incomplete.

5.      Please set forth the actual language of each request in full immediately prior to your response or objection to the request.

6.    If you object to any request, specify the part to which you object, state your objection(s), state all factual and legal justifications that support your objection(s), and respond to the remainder of the request to which you do not object.

7.    If an objection is made to any request herein, all Documents covered by the request not subject to the objection should be produced.

8.    With respect to any document that you refuse to produce on the ground of attorney-client privilege, on the ground of privilege for materials prepared in anticipation of litigation or for trial, or on the ground of any other privilege, please state the following:

    a.    the full identity of the document, including the following:

        i.    the date of the document;

        ii.    its title (if any);

        iii.    its authors, addresses, recipients, or parties;

        iv.    the nature of the document (*e.g.*, letter, memorandum, *etc.*);

        v.    the individual or source from whom or from which you obtained it; and

        vi.    its present location and identity of its custodian;

    b.    whether your objection or refusal is directed to the entire document or part thereof;

    c.    if your objection or refusal goes to part of the document, specify the specific part(s) of the document to which your objection or refusal is directed;

    d.    the specific factual basis which gives rise to the objection or refusal; and

    e.    the specific legal ground on which the objection or refusal is based.

9.      If a requested document is no longer in your possession, subject to your control, or is no longer in existence, you should include in your response to the Request:

      a.      whether the document is: missing or lost, destroyed, transferred to another, or has been otherwise disposed of;

      b.      the reasons for, and circumstances surrounding, any of these dispositions;

      c.      the date or best approximate date of any such disposition;

      d.      its type (e.g., letter, interoffice memo), subject matter, title, date, and the number of pages thereof;

      e.      the identity of each person who participated in its preparation;

      f.      the identity of each of its signers;

      g.      the identity of each person to whom it was addressed or sent or by whom it was reviewed or received; and

      h.      the identity of each person represented or purportedly represented by the persons identified in response to subparagraphs (b), (c) and (d), above.

10.     If any Document requested was transferred to a third party over whom you claim to lack control, please identify: (i) the Document by author, date, and subject matter, (ii) the date and circumstances surrounding the transfer, (iii) the reason for the transfer, (iv) the person or entity to whom transferred, (v) the present location of the Document, and (vi) the date and manner in which you can or may obtain the Document.

11.     Plaintiff requests that you produce each Document that is responsive to these requests, along with all drafts thereof, in its entirety without abbreviation or redaction. If any portion of a Document is responsive to a request, the entire Document shall be produced, including any and all attachments thereto.

12.     The omission of any Documents or things from your responses shall be deemed a representation that such Documents and things are not known to you, your agents, counsel, or other representatives at the time of the service of the responses or thereafter. Plaintiff may, before or at the time of hearing, move the Court for an Order excluding from evidence all tangible or intangible Documents or things that were known to Defendant at the time of its responses to these requests but not disclosed in its responses thereto.

13.     The use of the singular herein shall be deemed to include the plural.

14.     The use of the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

15.     The terms "all," "any," and "each" shall be construed as encompassing any and all.

16.     For purposes of interpreting or construing the following requests, the terms used are to be given their most expansive and inclusive interpretation unless otherwise specifically limited in the request itself. Verb tenses shall be interpreted to include past, present, and future tenses; references to a gender shall be interpreted to include the masculine, feminine, and neuter; and the word "including" should be read as "including, but not limited to" and the word "includes" should be read as "includes, but is not limited to."

17.     Defined terms may or may not be capitalized or made uppercase; the given definitions apply even if a term in question is not capitalized or made uppercase.  No waiver of a definition is implied by the use of a defined term in a non-capitalized or lowercase form.

18.     Unless otherwise specified, all requests are limited to information pertaining to marketing within the District of Columbia, or the sale of Defendant's products or services within the District of Columbia, including information pertaining to any decisions and actions affecting

6

Defendant's marketing or sales within the District of Columbia, regardless of where those decisions or actions took place.

19.     Unless otherwise specified, all requests cover the period from May 2017 through the present.

## DOCUMENT REQUESTS

1.     All Documents referred to or relied upon in responding to Plaintiff's First Set of Interrogatories.

2.     Documents sufficient to show all marketing materials, including the dates for which each marketing material was in use, used to represent and/or highlight ExxonMobil's efforts to invest in, along with the production and use of, "clean" energy and environmentally beneficial technology (*See generally* Compl. ¶¶ 21-98).

3.     All Documents concerning studies relating to Defendant's "clean" energy and environmentally beneficial technology representations, including quantitative and qualitative analyses, marketing studies, market research, focus group reports, customer surveys, and sales and profitability analyses, to the extent that such studies cover District of Columbia consumers (including studies covering consumers nationwide and thus encompassing District of Columbia consumers).

4.     All Documents concerning the decision(s) to highlight Exxon Mobil's investments in, and production and use of "clean" energy and environmentally beneficial technology in its Representations.

5.     All Documents concerning any decision to alter or change any of the "clean" energy and environmentally beneficial technology representations at issue.

6.     All Documents concerning discussions about the effectiveness of the "clean" energy and environmentally beneficial technology representations, to the extent that such discussions cover District of Columbia consumers (including discussions covering consumers nationwide and thus encompassing District of Columbia consumers) (Compl. ¶¶ 62, 80, 88).

7.     All Documents sufficient to identify the person(s) primarily responsible for creation of Your 2019 Summary Annual Report ("2019 Report") (Compl. ¶ 21).

8.     All Documents concerning consumer understanding of or response to, including but not limited to, consumer surveys, whether prepared by you or by third parties, to the "clean" energy and environmentally beneficial technology representations, to the extent that such surveys or other Documents cover District of Columbia consumers (including surveys or other Documents covering consumers nationwide and thus encompassing District of Columbia consumers).

9.     Documents sufficient to identify any person or entity involved with the marketing of your investments in, along with the production and use of, "clean" energy and environmentally beneficial technology.

10.     Organizational charts or other Documents sufficient to show your agents or employees primarily responsible for the marketing and advertising of the "clean" energy and environmentally beneficial technology representations.

11.     Documents sufficient to identify any third-party marketing firm responsible for the marketing concerning ExxonMobil's investments in, along with the production and use of, "clean" energy and environmentally beneficial technology.

12.     Documents sufficient to show Defendant's basis for representing that your "natural gas" is "clean" (Compl. ¶ 30).

13.     Documents sufficient to show Defendant's basis for representing that your CCS technology minimizes harmful environmental impacts (Compl. ¶ 38).

14.     Documents sufficient to show Defendant's basis for the representation that it is "meeting the world's growing energy needs while reducing emissions" and is taking "near-term actions...to prepare for a lower-carbon future" as mentioned in ExxonMobil's 2019 Report (Compl. ¶ 21).

15.     Documents sufficient to identify the "partnerships and collaborations" regarding your "environmental efforts" as mentioned in the 2019 Report (Compl. ¶ 21).

16.     All Documents concerning Defendant's prediction that its partner, Synthetic Genomics, will be able to produce 10,000 barrels of algae-based biofuels per day by 2025 (Compl. ¶ 36).

17.     All Documents concerning Defendant's prediction of its per day traditional fossil fuel production by 2025 (Compl. ¶ 85).

18.     Documents sufficient to show the proportion of Defendant's investment in, use of, and development of "biofuels" as compared to Defendant's investment in and use of fossil fuels.

19.     Documents sufficient to identify any person or entity primarily responsible in the decisions regarding ExxonMobil's investments in cleaner forms of energy (Compl. ¶ 13).

20.     Documents sufficient to show the percentage of Defendant's investments in "clean" energy and environmentally beneficial technology as compared to or in proportion to Defendant's investments in exploring for fossil fuels and developing infrastructure to refine and deliver these fuels.

21.     All Documents related to Defendant's scale of operations, as noted on page 12 of the 2019 Report (Compl. ¶ 21), involving and use of "clean" energy and environmentally beneficial technology in proportion to Defendant's production involving and use of fossil fuels.

22.     All Documents which show the percentage of Defendant's business lines, as mentioned on pages 16-17 of the 2019 Report (Compl. ¶ 21), which engage in "clean" energy and environmentally beneficial technology as compared to or in proportion to Defendant's engagements in fossil fuels.

23.     Organizational charts or other Documents sufficient to show the organizational structure of Defendant.

24.     All Documents concerning any consumer complaints, questions, or confusion concerning representations that Defendant engages in and has invested significantly in the production and use of "clean" energy and environmentally beneficial technology.

25.     All Documents concerning communications between you and any government regulatory agency regarding your use of the "clean" energy and environmentally beneficial technology representations.

26.     All Documents concerning communications between you and any government regulatory agency regarding your investments in "clean" energy and environmentally beneficial technology representations.

27.     Documents sufficient to identify the specific "consumers goods and industrial products" which derive from Defendant's chemical manufacturing operations, as mentioned on page 17 in Defendant's 2019 Report (Compl. ¶ 21), specifically goods and products related to the allegations in ¶ 58 of the Complaint.

28.     All Documents which show Defendant's studies concerning the link between fossil fuels and climate change and the overall impact which Defendant's operations have on the environment, specifically regarding the operations which Defendant represents as being "clean" and/or environmentally beneficial (*see* Compl. ¶¶ 62, 80, 88).

29.     Documents sufficient to show your policies or procedures with respect to the retention or destruction of documents and/or social media content.

30.     All Documents Defendant intends to offer in defense of Plaintiff's claims, including but not limited to any documents Defendant intends on using in support or opposition of summary judgment, or as trial exhibits.

Dated: June 11, 2020                    **RICHMAN LAW GROUP**

/s/ Kim E. Richman
Kim E. Richman
8 West 126th Street
New York, New York 10027
Telephone: (718) 705-4579
Facsimile: (718) 228-8522
krichman@richmanlawgroup.com